## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KIKI IKOSSI,                          :
                                      :
         Plaintiff,                   :
                                      :
    v.                                : Civil Action No. 04-1392 (JR)
                                      :
GORDON R. ENGLAND, Secretary,         :
Department of the Navy, et al.,       :
                                      :
         Defendants.                  :

### MEMORANDUM

         Plaintiff sued her former employer for discrimination
based on sex, race, age, and national origin, in violation of
Title VII and the Age Discrimination and Employment Act.  She
also alleged illegal retaliation, violation of her rights under
the Family and Medical Leave Act, and termination from employment
not consistent with the Civil Service Reform Act.  Defendants
moved to dismiss or for summary judgment.  On September 30, 2005,
an order was issued granting the motion.  The reasons for that
order are set forth below.

### Background

         Kiki Ikossi was employed as an electrical engineer at
the U.S. Naval Research Laboratory from October 13, 1998 until
her removal on April 23, 2003.  She is a Cypriot-American over 40
years old and holds a Ph.D. in electrical and computer
engineering.  She alleges[1] that she was subjected to a hostile

---

         [1] For convenience, the present tense is used throughout this
memorandum, as if it had been issued contemporaneously with the

work environment, denied recognition for her work, and denied
opportunities for advancement that were given to younger, less
qualified males.  In September 2002, she was given an official
letter of reprimand following an altercation with a co-worker.
After a number of subsequent confrontations and conflicts, her
supervisor proposed on December 2, 2002 that she be suspended for
14 days.  Plaintiff took substantial periods of leave beginning
in late November, and then intermittent FMLA leave beginning in
late December.  On February 5, 2003, while plaintiff was on
leave, the proposed suspension became a proposed removal, in part
because of plaintiff's alleged failure to coordinate her
intermittent leave with her work responsibilities.  Plaintiff
returned to work in March 2003.  She was removed from her
position on April 23, 2003.

Plaintiff appealed her removal to the Merit Systems
Protection Board (MSPB) on May 20, 2003.  She filed her complaint
in this case on August 16, 2004.  Here she alleges discrimination
(wrongful termination and hostile work environment) based on sex,
national origin, and age under Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in
Employment Act (ADEA), 29 U.S.C. § 621 et seq.; retaliation under
Title VII and the ADEA for having filed her EEO complaint;
interference with her right to take leave and then retaliation

September 30, 2005 order.

for taking leave under the Family and Medical Leave Act, 29
U.S.C. § 2601 <u>et</u> <u>seq.</u>; and termination inconsistent with the
requirements of the Civil Service Reform Act (CSRA) that
employment actions may only be taken if they "will promote the
efficiency of the service," 5 U.S.C. § 7513(a).

### **Analysis**

### **Jurisdiction**

The jurisdictional issues in combined EEO/MSPB cases
are "extremely complicated," <u>Butler v. West</u>, 164 F.3d 634, 638
(D.C. Cir. 1999), even when the facts are straightforward, and
this case is anything but straightforward.  Three very fact-
specific jurisdictional questions must be resolved.

<u>1. Did plaintiff fail to exhaust her administrative
remedies before the MSPB?</u>

No.  MSPB appeals of agency employment actions are
initially brought to an Administrative Judge (AJ).  The AJ issues
an initial decision that becomes a final decision unless it is
appealed to the full MSPB within 35 days. 5 C.F.R. 1201.113 -
.114.  In cases challenging agency employment actions under the
CSRA that allege illegal discrimination -- so called "mixed
cases" -- plaintiffs may pursue their claims in federal district
court if the MSPB has not issued a judicially reviewable decision
within 120 days of the filing of an appeal.  <u>See generally</u>
<u>Butler</u>, 164 F.3d at 637-39.

Plaintiff filed a mixed case appeal of her removal with the MSPB on May 20, 2003.  An AJ conducted an administrative hearing on August 28, 2003.  On December 17, 2003, before the AJ reached a decision, the parties settled the case and asked the AJ to dismiss it.  On that same day, ignorant of the settlement, the AJ issued his initial decision granting the government's motion to dismiss and indicating that his decision would become final on January 21, 2004.  Defs.' Ex. 1.  The settlement agreement permitted plaintiff's withdrawal within seven days, Pl.'s Ex. 93, and she exercised that option December 22, 2003.  See Defs.' Ex. 2 at 5.  Acting pro se, she sent the AJ a letter informing him of her withdrawal from the settlement, asking for assistance in obtaining counsel, and indicating that she intended to continue her struggle against defendants -- but not explicitly seeking an appeal of the AJ's dismissal order.  Id. at 4.  On January 12, 2004, the MSPB advised plaintiff by letter that the Board was "considering [her] correspondence as a petition for review of the initial decision issued by [the AJ]" and initiating the review process.  Id. at 1.  The MSPB had not ruled on August 16, 2004, a date more than 120 days after the MSPB considered the appeal to have begun, when plaintiff filed the present suit.[2]

---

[2] On November 23, 2004, the full MSPB remanded the appeal to the AJ for a factual determination as to whether plaintiff's withdrawal from the settlement agreement was timely. Pl.'s Ex. 97.  On December 27, 2004, the AJ dismissed the appeal without prejudice, so that plaintiff could pursue the present case.

Defendants insist that plaintiff's failure to file a document labeled "petition for review" is fatal.  They are mistaken.  Both the AJ and the full MSPB treated plaintiff's letter as a petition for review, and the AJ found the government estopped from continuing to litigate that point.  See Pls.' Ex. 98 at 2 n.2. Especially since I must read plaintiff's pro se letter liberally, see, e.g., Toolasprashad v. Bureau of Prisons, 286 F.3d 576, 583 (D.C. Cir. 2002), it should clearly be considered a petition for review.  There has been no failure to exhaust.

2. Did plaintiff's pre-termination EEO complaint merge into her MSPB complaint?

No.  At the time plaintiff filed her MSPB claim, she had an ongoing non-mixed EEO case relating to pre-termination complaints.  In fact, plaintiff checked a box on her MSPB appeal form indicating that she had filed an EEO action concerning the same adverse action. Defs.' Ex. 28.  The elaborate rules governing mixed case complaints require that plaintiffs file either an EEO complaint or MSPB appeal, but not both.  29 C.F.R. § 1614.302(b).  For that reason, the MSPB sought clarification from plaintiff as to whether it had jurisdiction over her case. Defs.' Ex. 29.  Plaintiff's then-counsel responded that the EEO

complaint involved only pre-termination claims.[3]  Defs.' Ex. 30.
This letter allowed the case to be docketed.

On September 16, 2003, the agency's EEO office
dismissed plaintiff's EEO complaints, stating that plaintiff was
"afforded the opportunity to litigate the claims contained in
[her] EEO complaint before MSPB."  Pl.'s Ex. 91 at 1.  Plaintiff
asserts that, by virtue of that dismissal, her "pre-termination
[EEO] claims were incorporated into [her] mixed case appeal."
Pl.'s Opp'n Mot. Dismiss at 14.  However, despite the EEO
office's statements, the MSPB has limited jurisdiction that would
not cover these complaints, see 5 C.F.R. § 1201.3 (listing
appealable actions), and there is no indication in the record
that any of these complaints has been directly raised before the
MSPB.[4]  Once the EEO case was dismissed, plaintiff had 90 days in
which to bring the claims in that case to district court.  42
U.S.C. § 2000e-16(c).  She did not do so, and she may not raise
these claims at this late date.

3. Does this Court have jurisdiction to review
plaintiff's FMLA or CSRA claims?

No.  The FMLA provides a private right of action for
private employees, but not for federal employees.  Mann v. Haigh,

---

[3] The MSPB appeal form challenged only plaintiff's
termination.  Pls.' Ex. 90 at 4.

[4] Of course, evidence of pre-termination discrimination is
relevant to evaluation of the wrongful termination claims.

120 F.3d 34, 37 (4th Cir. 1997).  Federal employees enjoy an independent right to challenge before the MSPB adverse employment actions that violate federal law, 5 U.S.C. § 7701(c)(2)(C), including violations of the FMLA.  Niimi-Montalbo v. White, 243 F. Supp. 2d 1109, 1120 n.4 (D. Haw. 2003) (finding jurisdiction to review FMLA matters associated with MSPB complaints); Ramey v. U.S. Postal Serv., 70 M.S.P.R. 463, 467 (1996) ("If an adverse action is predicated on the agency's erroneous interference with an employee's rights under the FMLA, such adverse action is in violation of law, and it may not be sustained.").  Because the right of federal employees to challenge violations of the FMLA arises only incident to their right to appeal to the MSRB, however, I can entertain plaintiff's FMLA claims only if they are associated with adverse actions actually appealable to the board. See Ploss v. MSPB, 4 Fed. Appx. 940, 942, 2001 WL 130721, at **2 (Fed. Cir. 2001).  Plaintiff's claims of wrongful termination in retaliation for taking FMLA leave would qualify, but her more general claims of attempting to interfere with her FMLA right to leave do not.  See 5 C.F.R. § 1201.3 (listing appealable actions).

Although plaintiff's termination-based claims clear this initial jurisdictional hurdle, a different problem ultimately precludes my jurisdiction over all of plaintiff's CSRA claims, including her FMLA-based claims.  Understanding the

problem requires a review of the aforementioned "extremely complicated" appeal procedures under the CSRA.

The CSRA requires that any adverse personnel action taken by an agency be "only for such cause as will promote the efficiency of the service." 5 U.S.C.A. § 7513(a). Employees may appeal eligible adverse actions to the MSRB that they believe violate this requirement. 5 U.S.C.A. § 7701(a). A final decision of the MSRB is then appealable to the U.S. Court of Appeals for the Federal Circuit, which reviews the agency record using a deferential standard of review.[5] 5 U.S.C.A. § 7703(b)(1). Ordinarily, the Federal Circuit has exclusive jurisdiction over appeals of MSRB decisions. However, when a plaintiff asserts a discrimination claim in addition to a CSRA claim, the claims form a "mixed" case. There are two ways that a mixed case may reach a federal district court. First, after a final decision from the MSRB, the plaintiff may appeal both parts of a mixed case (i.e., the CSRA adverse action claim and the discrimination claim) to the district court. 5 U.S.C.A. § 7703(b)(2); Powell v. Dep't of Defense, 158 F.3d 597, 598-99 (D.C. Cir. 1998). The district court then reviews the

_____

[5] The court reviews the record and sets aside any agency action, findings, or conclusions found to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703.

discrimination claims de novo, but reviews the CSRA claims upon the administrative record using the same deferential standard of review as the Federal Circuit.  Second, if no final decision is forthcoming from the MSRB 120 days after the appeal is filed, the plaintiff may file a civil action in district court "to the same extent and in the same manner" as allowed under Title VII and other anti-discrimination statutes.  5 U.S.C.A. § 7702(e)(1)(b).  This jurisdictional grant is concurrent with the MSRB, and does not deprive the MSRB of its authority or responsibility to render a decision on either part of the mixed case.  Lynch v. Federal Deposit Insurance Corporation, 60 M.S.P.R. 447, 449 (1994)(Board retains jurisdiction over adverse action claims where appellant has also filed a district court action under § 7702(e)); Padilla v. Dept. of Air Force, 58 M.S.P.R. 561, 566 (1993)("Board law...permits simultaneous adjudication of a mixed case appeal before the Board and a United States District Court.").

Plaintiff asks this court to decide whether the U.S. Naval Research Laboratory's handling of her dismissal squares with the requirements of the FMLA and "the efficiency of the service," and relies upon § 7702(e)(1)(B) for jurisdiction.  Her reliance is misplaced.  The text of § 7702(e)(1)(B) grants employees the right to proceed with a claim under the civil rights statutes in federal district court, but only in that manner and to that extent.  § 7702(e)(1)(B); see Vanover v. O'Leary, 967 F.Supp. 1211, 1220-21 (N.D.Okl. 1997) ("[T]he

- 9 -

district court is not empowered with the same concurrent
jurisdiction to review the termination decision as in the case
when the MSPB has issued a final opinion in a 'mixed' case.");
McGovern v. E.E.O.C., 28 M.S.P.R. 689, 691 (1985) ("[Section
7702(e)(1)(B)] provides the appellant with an alternative and
additional route of appeal of his discrimination claims,
simultaneous, but not necessarily superior, to his Board
appeal.") (emphasis added).  The section was enacted by Congress
to "protect[] the existing rights of an employee to trial de novo
under the civil rights act" so that the discrimination part of a
mixed claim does not get unduly delayed by the MSRB process.
H.R. Conf. Rep. 95-1717 at 139, 1978 U.S.C.C.A.N. 2860, 2872-73.
Nothing in section 7702(e)(1)(B) grants a district court
jurisdiction over the nondiscrimination/retaliation aspects of a
mixed case.

Instead, plaintiffs who wish to bring their entire
mixed case to federal district court must await a final decision
of the MSRB and appeal the decision under § 7703(b) based on the
administrative record.  Vanover, 967 F.Supp. at 1221 ("[W]here
the MSPB has not issued a final decision, neither the Federal
Circuit, nor the district court would have the expertise to
address the issue of whether a federal employee's termination was
for the efficiency of the service."); McGovern, 28 M.S.P.R. at
691 ("[W]e do not believe that the District Court can be said to
have primary jurisdiction over this case until the Board has

- 10 -

issued a final Opinion.").  When the MSRB issues a final ruling

on plaintiff's CSRA claims and the administrative record is

filed, this court could review the decision for arbitrariness,

abuse of discretion, and substantial evidence.  5 U.S.C.A.

§ 7703.  Until then, this court has no jurisdiction over

plaintiff's CSRA claims, including her allegations of FMLA

violations.[6]

**Summary Judgment**

Summary judgment will be granted when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

---

[6] Only one court, the Sixth Circuit, has ever held that the
CSRA side of a mixed claim can be heard by a district court
without a final MSRB decision or an administrative record.  See
Valentine-Johnson v. Roche, 386 F.3d 800, 810-12 (2004).  This
case is best understood as confined to its "special factual
circumstances."  Id. at 811.  In Valentine-Johnson, the agency
defendant argued to the MSRB AJ that the plaintiff's only options
were to pursue her administrative claim before the AJ without
mentioning discrimination, or to file "the complete case" with
the district court.  Id. at 807.  The AJ apparently accepted the
argument and dismissed the case pending the outcome of
plaintiff's district court action.  Then, before the district
court, the agency "made a 180-degree change in its position,
arguing that because [the plaintiff] had failed to exhaust her
administrative remedies with the MSPB regarding her termination
claim, this claim could not be heard in the district court."  The
Sixth Circuit applied the doctrine of judicial estoppel to
prevent the agency from "abusing the judicial process through
cynical gamesmanship."  Id. at 812.  In addition, the Court
emphasized that the plaintiff had relied to her detriment on the
AJ's incorrect advice that she drop her claims before the MSRB
and proceed to the district court with the whole case.  Thus,
even in its unusual ruling allowing the district court to review
the plaintiff's adverse action CSRA claim de novo, the Sixth
Circuit underscored the incorrectness of proceeding to district
court with a CSRA claim without a final judgment from the MSRB.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in the nonmoving party's favor and accept the evidence of the nonmoving party as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, in proffering evidence to defeat a motion for summary judgment, the nonmoving party cannot simply rely on conclusory statements or allegations.  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must come forward with specific facts that, when viewed in the context of the record as a whole, could reasonably lead a rational trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

Summary judgment on discrimination and ADEA claims

When confronted with a motion for summary judgment, plaintiff's discrimination and ADEA claims must be examined under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Plaintiff must first establish a prima facie case of discrimination/retaliation. E.g., Paquin v. Federal Nat'l Mortgage Ass'n, 119 F.3d 23, 27 (D.C. Cir. 1997). If a prima facie case is established, defendant must show that there was a "legitimate, nondiscriminatory reason" for terminating plaintiff.  Id.  If defendant meets this burden, plaintiff must then show that "defendant's proffered reason is

- 12 -

but a pretext for discrimination" or retaliation.  See id.  The

same standard applies to plaintiff's Title VII and ADEA claims.

Id.; Gleklen v. Democratic Congressional Campaign Comm., Inc.,

199 F.3d 1365, 1367 (D.C. Cir. 2000).

      The applicable requirements for a prima facie case in

this Circuit are as follows:

> To state a prima facie claim of disparate treatment
> discrimination, the plaintiff must establish that
> (1) she is a member of a protected class; (2) she
> suffered an adverse employment action; and (3) the
> unfavorable action gives rise to an inference of
> discrimination. . . .  For retaliation claims, . . .
> the prima facie requirements are slightly different.
> The plaintiff must show '1) that she engaged in a
> statutorily protected activity; 2) that the employer
> took an adverse personnel action; and 3) that a causal
> connection existed between the two.'

Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999) (citations

omitted).

      Plaintiff satisfies the first and second elements for

the disparate treatment and retaliation claims.  She is a

Cypriot-American woman over the age of 40 who had filed an EEO

complaint before she was terminated.  As to the "inference of

discrimination" and "causal connection" elements, she makes a

great many factual assertions, among them that she was denied

advancement opportunities provided to younger men, that she was

subject to discriminatory office placement, that she was

disciplined more harshly than similarly situated men, that

defendants engaged in a general practice of sex and national

origin discrimination, and that defendants engaged in a pattern
of retaliatory activity.  Defendant disputes many of these
claims, but, since these same issues are engaged at a later stage
of the required analysis, I will assume for the purpose of this
analysis that plaintiff has presented a prima facie case.  See
Waterhouse v. District of Columbia, 298 F.3d 989, 993 (D.C. Cir.
2002).

This assumption shifts the burden to the defendants to
provide a "legitimate, nondiscriminatory reason" for terminating
the plaintiff.  Paquin, 119 F.3d at 27.  Defendants have come
forward with several reasons for plaintiff's dismissal, each of
which was analyzed in the agency's Decision to Remove letter,
Defs.' Ex. 16, and Detailed Analysis, Defs.' Ex. 17.  These
reasons include multiple charges of delay in performing assigned
work and several instances of failure to follow instructions.
Because, to survive summary judgment, plaintiff must show that a
reasonable jury could find these reasons pretextual, a detailed
explanation of these charges is appropriate.

### Delay in performing tasks

The first charge of delay in performing assigned tasks
relates to low-temperature measurements originally scheduled for
August 2002.  To begin the measurements, plaintiff needed a
copper plate from a colleague and became frustrated when he did
not provide it to her satisfaction.  Plaintiff reacted by yelling
at the colleague.  That led to a formal reprimand letter from her

- 14 -

supervisor, Mr. J. Bradley Boos.  Defs.' Ex. 11.  After the
yelling incident, Mr. Boos attempted to arrange a productive
meeting with plaintiff to reschedule and accomplish the
measurements.  As documented by the defendants, plaintiff failed
to make herself available to meet with her supervisor, Mr. Boos,
over several months in the fall of 2002.  His attempts included
very specific e-mail requests to meet at certain times, as well
as requests for information regarding the status of the
measurements and the equipment with which they would be
performed.  E.g., Defs.' Ex. 23 at 11 (In an e-mail on 9/23/02:
"Please make this your highest priority.  This means that I am
directing you to come to my office at the specified time unless
you can convince me beforehand, and obtain my approval, that
another activity has a higher priority.").  However, plaintiff
failed to make herself sufficiently available from mid-September
through at least November, resulting in serious delays in the
progress of the measurements.

        Apparently suspicious of Mr. Boos's motives after her
letter of reprimand, plaintiff attempted to limit communication
with Mr. Boos to written replies and insisted on the presence of
a third party for his proposed meetings.  Defs' Ex. 20.  Further,
her written responses to Boos's reasonable questions were vague
and non-responsive.  Asked about the owner of the equipment she
was using, she replied:  "I regret that the current events do not
permit me to disclose the owners of that system as I do not want

other innocent scientists to become victims of the irrationality that ravages this branch," Defs.' Ex. 22; and "If you feel I need to clarify the ownership of the system I am working on, as far as I know the system has a U.S. Navy sticker on so I can assume the owner is the U.S. Navy.  The innocent scientists who led me to the system without knowing what you where [sic] up to are the one's [sic] I do not want to get in your rage for obvious reasons." Defs.' Ex. 20.  She also questioned Mr. Boos's authority over her.  For example, she was asked in a deposition, "Do you believe that Mr. Boos has authority to identify specific, narrowly defined tasks for you to accomplish?" Defs.' Ex. 18 at 154.  She responded, "I have no knowledge of that.  My assessment is no." Id.  Mr. Boos was left to explain to plaintiff that written responses could not convey the level of scientific detail for him to supervise the project, and that summoning third parties for day-to-day encounters was unproductive and an imposition on their time. Defs. Ex. 21.

The plaintiff took FMLA leave in late December and early January, without a resolution regarding the measurements.  In response to the intermittent nature of her leave, Mr. Boos asked plaintiff on December 20, 2002 to provide him with a status report on her assignments and a schedule of the dates she would be available. Defs.' Ex. 17 at 2.  He asked that this report be delivered on the next day she came to work.  Plaintiff did not submit this report until January 21, 2003, despite coming to work

on December 23, 2002 and January 9, 2003.  Id.  This lack of communication left Mr. Boos with no way to determine when plaintiff would be at work or to learn about the status of her projects.

A second incident of negligence in performing assigned work occurred with regard to plaintiff's role as co-principal investigator of the Micromachining Project with Optical Sciences. Defs.' Ex. 17 at 3.  In this role, plaintiff was responsible for processing certain samples.  Dr. Will Rabinovich, plaintiff's co-principal investigator, informed Mr. Boos that plaintiff missed two commitments for processing these samples.  Id.  As of two weeks after the last deadline (which Dr. Rabinovich had been reduced to imposing after plaintiff's failure meet her responsibilities), plaintiff had not picked up the samples or taken any action to begin processing them.  Nor had she communicated to Dr. Rabinovich or Mr. Boos when the samples would be processed or how the work would be accomplished during plaintiff's pending FMLA leave.  These failures resulted in the straining of the relationship with an important client who depended on the samples.  Defs. Ex. 13 at 164-65.  According to Mr. Denis Webb, plaintiff's second-level supervisor, the harm to this relationship was "the straw that broke the camel's back." Id. at 165.  Because of these failures, Dr. Rabinovich told Mr. Boos that he could no longer work productively with plaintiff.  Defs.'s Ex. 17 at 3.  Ultimately, Mr. Boos took it

- 17 -

upon himself to process the samples.  He completed the task in three weeks, despite his own holiday leave and other higher priority work.  Id.

### Failure to follow instructions

Defendant's other reasons for terminating plaintiff relate to her failure to follow instructions.  She had been instructed to sign a travel document and return it to Mr. Boos. Id.  The form inaccurately stated that plaintiff owed money, so plaintiff took the position that she either should not or was not required to sign the form.  Pl.'s Opp'n to Summ. J. at 13.  She admitted in her deposition, however, that Mr. Boos had told her that he knew that she did not owe money, but that she still had to sign the form to acknowledge its receipt and return it to him by November 27, 2002.  Defs.' Ex. 13 at 310.  The form itself stated that plaintiff's signature only acknowledged its receipt, Defs.'s Ex. 16 at 2, and the Travel Office specifically confirmed this to the plaintiff on November 21, 2002.  Defs.'s Ex. 17 at 7. Moreover, on December 2, 2002, the Travel Office told plaintiff that the form must be signed by her and her supervisor.  Id. Plaintiff failed to do this, and indeed did not sign the form until December 9, 2002 when she faced a proposed letter of suspension.  Id.  Even then, she did not return the form to Mr. Boos as instructed, but forwarded the letter directly to the Travel Office.  Id.

A final incident of failure to follow instructions
regarding an office move is offered as further justification of
the decision to terminate plaintiff, although it is not mentioned
as an official reason for her discharge.  The incident occurred
shortly into Mr. Boos's tenure as plaintiff's supervisor.  The
move was part of an office reorganization plan that required
plaintiff to move from one shared office into another.  Plaintiff
protested that the proposed office would be too crowded for her
to adequately perform her duties.  Pl.'s Ex. 20.  She also
expressed her feelings that the move was gender-motivated, since
other male colleagues had private offices or were allowed to set
up their offices in empty laboratories.  Id.  During two
discussions with Mr. Boos, plaintiff refused his instruction to
move her office.  Id.  To enhance their dialogue, Mr. Boos set up
a meeting with Ms. Lynda Heater, a human relations officer.  Id.
Plaintiff refused to attend.  Id.  Mr. Boos was therefore forced
to issue a deadline for plaintiff's office move and to consider a
letter of suspension.  Pl.'s Ex. 21 and 22.  Three weeks after
the instruction to move, and only two days before the deadline,
plaintiff finally agreed to the move.  Pl.'s Ex. 23.

These proffers of legitimate non-discriminatory reasons
for plaintiff's removal shift to her the burden of showing that
the are merely a pretext for discrimination/retaliation.  To show
pretext, a plaintiff may use a combination of: "(1) the
plaintiff's prima facie case; (2) any evidence the plaintiff

- 19 -

presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) . . . ."  Aka v. Washington Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998).

To meet this burden, plaintiff alleges (a) that she was subject to discriminatory office placement; (b) that she was disciplined more harshly than similarly situated men; (c) that defendants engaged in a general practice of sex and national origin discrimination; (d) that defendants engaged in a pattern of retaliatory activity; and (e) that she was denied advancement opportunities and proper recognition of her achievements and that provided to younger men.  The first four of these allegations are easily dismissed.

(a) Plaintiff alleges that she and another female employee were singled out for office displacement and that the plaintiff was ordered to move to a cramped, shared office while similarly situated male employees were allowed to keep private offices or set up their office in spacious, unused laboratories. PSOF ¶ 90-91.  However, plaintiff offers no details substantiating her claim that any males who received disparate treatment were indeed similarly situated with regard to their needs, experience, and relationship within the branch reorganization that necessitated the office move.  While, "as a

rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." Green, 164 F.3d at 675 (finding that allegation that plaintiff was more qualified than applicant ultimately hired was too conclusory to survive summary judgment). As the Green court went on to say, "[a]ccepting such conclusory allegations as true...would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." Id.  What the record does show is that the order to move offices was the beginning of the plaintiff's problems with the supervisor who recommended her suspension, Mr. Brad Boos. Numerous e-mails document Mr. Boos' attempts to have the plaintiff comply with the reorganization plan.  Thus, the circumstances surrounding the office move strengthen rather than undermine the evidence for the defendants' asserted non-discriminatory motive.

(b) Plaintiff also alleges that she was treated more harshly for raising her voice to a colleague than similarly situated male employees.  In particular, she alleges that her supervisor responded to an incident in which a male colleague yelled at her by treating them both to lunch so they could discuss their problems.  Pl.'s Ex. 45 at 164:16-168:22.  She also

provides incidents in which male colleagues had yelled, thrown
objects in frustration, and sexually harassed other colleagues,
all without receiving discipline as severe as plaintiff's letter
of reprimand.  However, none of these incidents involved
employees who were similarly situated.  In order to show that she
was similarly situated to a fellow employee, plaintiff must
"demonstrate that all of the relevant aspects of [their]
employment situation [are] nearly identical."  Neuren v. Adduci,
Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995).
In particular, the co-workers "must have dealt with the same
supervisor, have been subject to the same standards and have
engaged in the same conduct without such differentiating or
mitigating circumstances that would distinguish their conduct or
the employer's treatment of them for it."  Phillips v. Holladay
Property Serv., 937 F.Supp. 32, 37 (D.D.C. 1996).  The incident
in which the plaintiff raised her voice occurred after the
dispute involving the office move and was followed with
acrimonious meetings between the plaintiff and Mr. Boos.  These
meetings ultimately led Mr. Boos, after consultations with
additional supervisory personnel (including a female human
relations specialist), to consider a letter of reprimand to be
the best possible disciplinary route.  Pl.'s Ex. 43.  The
plaintiff does not explain whether other incidents with male
employees were preceded or immediately followed by similar

problems.  Additionally, none of the incidents plaintiff recounts involving male employees occurred under Mr. Boos's supervision. Because the supervisors and circumstances involved in the other incidents are different, these incidents do not provide evidence of disparate treatment of similarly situated employees.

(c)-(d)   Plaintiff's allegations of a general pattern of discriminatory and retaliatory activity, to the extent they are not conclusory, are based solely on the testimony of Ming Jey Yang.  Pls.' Oppn' to Summ. J. at 41.  Ms. Yang testified that she did not receive the credit she deserved on a project she worked on, and also that others received undeserved credit on another project she worked on (effectively diluting her deserved public recognition).  Pl.'s Ex. 102.  These incidents occurred under Mr. Boos, and Ms. Yang expressed her feeling that this was due in part to her gender and national origin.  Id.  Ms. Yang testified that she knew of other female employees who felt they had been treated inappropriately, but she also pointed to Mr. Rick Mango (a white male) as a victim of this sort of treatment.   See Defs.' Reply to Opp'n to Summ. J. at 13-14. Neither Mr. Mango nor any of the female employees cited by Ms. Yang was of a foreign national origin, and there was no testimony regarding the details of the incidents sufficient to overcome their conclusory nature.  Id.  Moreover, there was no testimony regarding any disciplinary actions against female

employees that would substantiate a charge of a general pattern
of retaliation.  In short, plaintiff is left with Ms. Yang's
feelings about the credit she deserved in two incidents, which
does not support a charge of a general pattern of discrimination
or retaliation, nor raise a genuine issue as to whether the
detailed analysis by senior management that led to plaintiff's
removal was merely pretext.  <u>See</u> Def.'s Ex. 17.

(e)  The strongest evidence of pretext that plaintiff
has presented relates to treatment by a previous supervisor,
Mr. Dietrich.  Plaintiff alleges that she was repeatedly denied
credit regarding her discoveries and findings in publications and
presentations, and that instead Mr. Dietrich let less qualified,
younger males receive the accolades and exposure such discoveries
generated.  These allegations, never addressed by the defendant,
might raise an inference regarding discriminatory treatment if
they were at issue in this case (and if they were not of such a
conclusory nature).  However, as the plaintiff admits, these
alleged professional slights did not rise to the level of adverse
employment actions, and they are material only to the question of
whether defendants' real reason for <u>terminating</u> the plaintiff was
her gender, national origin, or age.

It is here that the record documenting the troubles
between plaintiff and Mr. Boos from April 2002 until January 2003
is particularly important.  Even if a reasonable jury might

believe that Mr. Dietrich was improperly allowing male scientists
to garner credit for plaintiff's work, nothing about that
situation related to Mr. Boos and his difficulties with the
plaintiff about the office move, the yelling incident, the travel
document incident, and the scheduling problems involving
important measurements the plaintiff was responsible for
completing.  These incidents, over a nine-month period,
demonstrated the plaintiff's repeated failure to respect her
supervisor's authority and need to oversee her work.  Plaintiff
has pointed to no other incidents between Mr. Boos and female or
foreign-born scientists that suggest that his attempts to manage
her projects and discipline her for outbursts were motivated by
discriminatory animus.[7]

Finally, plaintiff offers a remark by her second level
supervisor Dennis Webb, that some of plaintiff's difficulties
with her working environment may have arisen because she is "not
a U.S. national" (Pl.'s Ex. 100 at 8), and a line from an e-mail
sent by a human resources official to Mr. Boos stating, "FYI -

_____

[7] Ms. Yang's testimony that Mr. Boos denied her appropriate
credit may raise a triable issue of fact as to whether Mr. Boos
is "unethical," or even denied her credit based on her gender or
nationality.  Pl.'s Ex. 102.  This is not enough, however, to
suggest that the defendants reasons for terminating  Ms. Ikossi
were pretextual.  The record shows a community effort by
Mr. Boos, his supervisors, and human relations staff to deal with
plaintiff's failures to meet with Mr. Boos, to obey instructions,
and to accomplish her tasks on time.  Such extensive and
documented attempts by the defendants to solve these problems
require a strong showing to be suspected as pretext.

- 25 -

with any e-mails or drafts you write, eventually you want to delete them as they are discoverable during a later hearing (i.e. EEO)" (Pl.'s Ex. 44).  The comment about plaintiff's nationality occurred when a firm hired by the plaintiff called Mr. Webb purporting to seek employment references with which to evaluate plaintiff's application.  Mr. Webb made the remark about plaintiff's nationality in an attempt to <u>mitigate</u> plaintiff's negative work history and increase her employability.  This comment, made long after plaintiff's dismissal and on her behalf, does not raise a genuine issue as to the motivation of her dismissal.  As for the e-mail, it was selectively cited by the plaintiff and in fact explicitly stated that all materials would be preserved for plaintiff's access in her EEO case.  <u>Id</u>.  In any event, there is no evidence that any documents were deleted, and numerous internal e-mails are part of the record.

On this record, there is no genuine issue in dispute that could lead a rational jury to conclude that the reasons given for plaintiff's discipline and ultimate removal was pretextual, much less that it was motivated by discriminatory or retaliatory reasons.  Summary judgment as to the discrimination and retaliation claims is therefore appropriate.

<u>Plaintiff's Rule 56(f) affidavit</u>

Plaintiff's counsel has filed a Rule 56(f) affidavit seeking depositions of four of defendants' employees.  The record

- 26 -

in this case is extensive, and all of the major factual disputes appear to be quite well fleshed out.  Further, plaintiff (through her former counsel) has already had at least two opportunities to examine her three most promising proposed witnesses under oath. Defs.' Opp'n to 56(f) Aff. at 2-3.  Plaintiff has not shown that these requested depositions would be "essential to justify [her] opposition." Fed. R. Civ. P. 56(f).


                              JAMES ROBERTSON
                        United States District Judge